EQUITABLE LIFE ASSUR. SOC. OF THE
UNITED STATES v. WELLS.

No. 7528.

Circuit Court of Appeals, Sixth Circuit.

Feb. 7, 1939.

Eugene B. Cochran, of Louisville, Ky. (Wm. Marshall Bullitt, Eugene B. Cochran, and Bruce & Bullitt, all of Louisville, Ky., on the brief), for appellant.

Wilbur Fields, of Louisville, Ky. (Woodward, Dawson & Hobson and Wilbur Fields, all of Louisville, Ky., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Suit upon two policies of group life insurance issued by appellant to Kendall Refining Company, herein called Kendall. William Green held a certificate under one of these policies for $1,000 and a similar certificate under the other for $4,000. He died January 18, 1934. If, under the policies Green's employment with Kendall terminated before his death, appellee, Executor of the estate of Lula G. Green, the beneficiary, was not entitled to recover; otherwise he was. The issue was therefore one of fact and appellee prevailed.

Appellant complains of the denial of its motion for a directed verdict.

I. H. Shearer was Sales Manager and Treasurer of Kendall. In 1930 he employed Green under an oral agreement as a Supervisor. Orla F. Crutchfield was an Assistant Supervisor. The two had a certain territory and their duties were to assist the distributors therein in promoting the sales of Kendall products and to arrange for new distributors. Green was required to make weekly reports to the home office not later than Tuesday, covering his activities and expenses for the preceding week and including his itinerary for the current week. He had the habit of indulging in protracted drinking spells. There is evidence that such had occurred twice prior to July, 1933, and that Denman Thro, Shearer's assistant, who had authority to discharge Green, told him in July, 1933, that if it was repeated his services would be automatically terminated at the end of any week the company failed to get his report on time. Notwithstanding this warning Green continued to engage in drunken sprees lasting from a week to two weeks at a time but was not discharged.

In September, 1933, Shearer talked to Green and told him that he was not giving his territory the attention that it required; that the company had put up with these drunken periods as long as it would stand it and that if another occurred it was equivalent to his resignation. Green replied: "If I go on one again I realize I'm through, and I don't hold anything against you."

In October, 1933, he engaged in another spree which lasted for two weeks. He made no report whatever to the home office until he sobered up. But he was not discharged.

In December, 1933, the home office failed to receive Green's weekly report, due around Christmas. This was ominous and an effort was made to locate him. Crutchfield finally found him on January 7, 1934, at the Niagara Hotel in Peoria, Ill. He was ill and just coming out of a drunken condition. Crutchfield telephoned Shearer at the home office in Bradford, Penna., and in obedience to instructions from Shearer took Green to the Harrison Hotel in Chicago. On January 9, Green telephoned Shearer and, according to Shearer, he said: "I realize what has happened and I realize that you meant what you said and I just wanted to tell you that I have secured a position with the Tidewater Oil Company and I am going to represent them in this territory in a capacity similar to the one I have with your company."

Shearer testified that he responded,— "that I was sorry the thing had occurred but that it had happened so often there was absolutely no possibility of us again considering him especially at that time." Further,—"Mr. Green also asked if I would have some one, preferably Mr. Thro, come out so that he could turn over to him all of the correspondence that he had pertaining to the territory. * * *" On cross-examination Shearer testified that he did not tell Green that he was discharged "in those words" and that he never sent him a letter of discharge or accepted any resignation from him.

Green had not secured a position with the Tidewater Oil Company and Crutchfield testified that before this telephone conversation Green had delivered to him the files consisting of the correspondence which had accumulated between December 19, 1933, and January 10 following, and that he was attending to this correspondence at the request of Green who was ill.

Shearer sent Thro to Chicago where he saw Green in his room at the Harrison Hotel on January 11. He testified that at that time he took over from Green the files in his possession. These were the same files which, according to Crutchfield, had already been turned over to him by Green. Thro testified further: "At that time I told him that, due to our friendship, we were sorry to see him leave our employ and go in the employ of a competitive company, but I wished him luck."

Crutchfield, who testified that he was present, although Thro stated that he did not see him there, gives an entirely different version of this conversation. He testified that, "Mr. Thro said, 'Will, how are you.' Mr. Green said, 'Pretty good.' Mr. Thro said, 'I am sorry Will, that this has happened.' Will said, 'I am too.' He says, 'There is no hard feelings.' He says, 'Well, take care of yourself Will.' That is about all that was said."

Premiums on the Green certificates were paid to the insurance company by Kendall up to February 1, 1934, but were afterwards refunded.

Boyd Herman, a clerk for Kendall, in charge of the insurance records, kept register cards for each employee, insured under appellant's group policies. These cards indicated that Green's insurance had terminated on December 31, 1933, but this data was not placed upon the card until February 9, 1934, when Herman first learned that Green's employment had terminated. No salary was paid Green for any part of January although he was carried on the payroll for the first half of the month but sometime before the 15th Shearer made the notation "out" opposite his name and on the 16th wrote certain distributors in Green's territory that he had resigned as of the first.

 Appellant in its brief does not insist that Green's employment was automatically terminated December 31, 1933, by reason of his prolonged December carousal and failure to file his weekly report due around Christmas but bases its motion for a directed verdict upon the evidence tending to show that Green was discharged or that his employment terminated on January 9. We cannot say that this is true as a matter of law. Shearer's testimony would so indicate but he knew at the time he testified that Green's lips were sealed and this is a circumstance to be considered, among others, by a jury in determining the credibility to be given to his testimony. See Mutual Life Ins. Co. of New York v. Sargent, 5 Cir., 51 F.2d 4, 6. Then, too, the contradictory testimony as to what passed between Green and Thro at the Harrison Hotel in Chicago was a matter peculiarly for the consideration of a jury. If a jury should believe Crutchfield's testimony it was sufficient to support a finding that Thro did not give Green any definite and certain notice that he was discharged.

 Upon a motion for a directed verdict the court does not pass upon the credibility of witnesses or undertake to reconcile contradictory testimony. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Rochford v. Pennsylvania Co., 6 Cir., 174 F. 81, 83; Minneapolis, St. P. & S. S. M. Ry. Co. v. Galvin, 6 Cir., 54 F.2d 202. We conclude that it was not error to deny the motion.

It is urged that the court erred in its instructions as follows: "The jury are further instructed that they should consider and weigh evidence offered to the effect that Mr. Crutchfield continued to consider Green an employee of the Kendall Refining Company after December 31, 1933; that Shearer, Green's supervisor, gave instructions concerning Green after December 31, 1933; and further, that the entries on the insurance register card were not made until February 9, 1934; and further, that the insurance premiums were paid until January 31, 1934; and that the policies are to be construed most favorably to the plaintiff. * * *"

 We think it was error to instruct the jury,—"* * * that the policies are to be construed most favorably to the plaintiff." The rule for the construction of written instruments applies to insurance policies equally with other contracts (Liverpool & London & Globe Ins. Co. v. Kearney, 180 U.S. 132, 135, 21 S.Ct. 326, 45 L.Ed. 460) but it is an invariable rule that where there is no doubt as to the meaning of any particular provision of the policy there is no room or need for construction. This rule applies here, for the policies are unambiguous; but, assuming the need for construction, it was error to submit such a question to the jury. It is a general rule that the construction of a written instrument is a matter of law for the court and not for the jury. We cannot say that the instruction complained of was harmless. It related to matters of substantial right and it followed immediately upon that part of the request which set forth items of evidence favorable to appellee's contention. See U. S. v. River Rouge Imp. Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339.

For this error the judgment is reversed and the case remanded for a new trial.