DUBUC LUCKE & CO., INC., Appellant,

v.

WALKER et al., Appellees.

[Cite as *Dubuc Lucke & Co., Inc. v. Walker* (2001), 143 Ohio App.3d 595.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000275.

Decided May 25, 2001.

*Thompson, Hine & Flory, L.L.P.,* and *Earle Jay Maiman,* for appellant.

*Dinsmore & Shohl, L.L.P., Frank T. Becker* and *Bryan E. Pacheco,* for appellees.

*Per Curiam.*

Defendant-appellees Cy Waddle, W.T. Walker, and T.S. Ballance were the major shareholders and directors of Somerset Oil, Inc., a Kentucky corporation. Although Somerset maintained a variety of business interests and assets, its primary emphasis was oil refining. Together with the minority ownership of the remaining appellees, Waddle, Walker, and Ballance controlled all 447 outstanding shares of Somerset. The shareholders sought to sell Somerset and engaged appellant, Dubuc Lucke & Co., Inc. ("DLC"), to assist them in finding a purchaser.

The contract governing the relationship between the shareholders and DLC was written by the shareholders. Apparently, this was not the normal practice for DLC, which would have preferred that its standard brokerage agreement govern the relationship. But DLC agreed to the terms as written by the shareholders. The shareholders insisted upon this arrangement because of some prior dealings with the principals of DLC.

When the shareholders had originally sought to sell Somerset, they had worked with a firm that preceded DLC and did business as DLK. The shareholders had

signed that prior firm's standard brokerage agreement and had come close to selling Somerset. But, unfortunately, the buyer's financing failed at the final moment. When the shareholders again considered seeking assistance from some of the same principals who had by then formed DLC, they apparently found DLC's standard contract to be too restrictive in view of their prior experience.

In the course of the shareholders' later relationship with the principals of DLC, the original buyer resurfaced with enhanced financial resources and agreed to purchase Somerset's oil-refining business. But the buyer was not interested in acquiring the rest of Somerset's assets, which primarily consisted of cash proceeds from land ventures, the value of the directors' life-insurance policies, and real estate.

Two mutually dependent and virtually simultaneous transactions were executed to facilitate the buyer's acquisition of a portion of Somerset and the shareholders' liquidation of the remaining assets. In the first transaction, the buyer purchased approximately 196 shares, or around forty-three percent, of Somerset for $5,700,000. This price was later adjusted to $4,800,000 in accordance with the terms of the stock purchase agreement. Second, the original shareholders redeemed their remaining 251 shares, or approximately fifty-seven percent of Somerset, by surrendering their shares directly to Somerset in exchange for cash and other assets unrelated to the oil-refining business. The value of the assets received by the shareholders in surrendering their stock to Somerset was approximately $7,000,000.

According to the shareholders, a buyer procured by DLC had purchased $4,800,000 of Somerset, and the shareholders had simply retained their remaining interest, subject to the redemption agreement. So DLC, in their view, would have been entitled to receive the agreed commission rate of five percent on the $4,800,000 sale, or $240,000.

By contrast, DLC viewed the transaction in the aggregate. It claimed that even though the transaction had occurred in two stages, the shareholders had "sold" all 447 shares of stock and had received compensation totaling at least $12,700,000. DLC calculated the commission owed to it in excess of $635,000, a difference of approximately $395,000 from the shareholder's calculation.

DLC further argued that the contract specified that the commission was due at closing and therefore should not have been based on the adjusted sale price, since the adjustment had occurred after closing. Accordingly, DLC asserted that it was owed five percent of the initial amount specified in the stock purchase agreement, $5,700,000. Thus DLC concluded it was entitled to $285,000, instead of $240,000, in compensation for the first transaction.

The difference in the parties' views of the two transactions and its implication for the amount of commission to which DLC was entitled arose prior to the culmination of the transactions. The parties wisely put their differences aside, and the deal successfully closed. Then, when their differences remained irreconcilable, DLC brought this breach-of-contract action, seeking compensation for the stock-redemption transaction and additional compensation for the stock-purchase transaction.

DLC and the shareholders each moved for summary judgment on a largely undisputed record. The parties essentially agreed on what had occurred in each transaction and that the nonexclusive brokerage agreement governed the amount of commission to which DLC was entitled. The parties differed on their characterization of the second transaction, how to interpret it under the terms of the nonexclusive brokerage agreement, and the effect of the adjustment to the first-stage sale price. The trial court granted summary judgment for the shareholders, and we affirm that decision.

■ We review the summary judgment entered in favor of the shareholders *de novo*, using the same standard that the trial court applied.[1] Under Civ.R. 56(C), summary judgment was appropriate if the shareholders demonstrated that (1) there was no issue of material fact, (2) the shareholders were entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for DLC, reasonable minds could only reach a conclusion adverse to it.[2] Because the parties made an effective choice of law in the brokerage agreement, we apply the law of the state of Kentucky in interpreting that pivotal document.[3]

The salient provisions of the brokerage agreement included the following:

"1. Shareholders are the owners of 100% of the common stock of Somerset Oil, Inc., a Kentucky Corporation, and have full power and right to sell and transfer all of said shares.

"2. Broker agrees to use its best efforts to obtain a buyer for said stock at a price and upon terms acceptable to the Shareholders.

"* * *

---

1. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243, 1245.

2. See *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 204, citing *Horton v. Harwick Chemical Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus.

3. See *Jarvis v. Ashland Oil, Inc.* (1985), 17 Ohio St.3d 189, 17 OBR 427, 478 N.E.2d 786, paragraph one of the syllabus; *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.* (1983), 6 Ohio St.3d 436, 6 OBR 480, 453 N.E.2d 683, paragraph one of the syllabus.

"4. In the event that the Broker procures a buyer ready, willing, and able to purchase the stock of Somerset Oil, Inc. at a price and upon terms acceptable to the Shareholders Broker shall be entitled to a commission equal to five percent (5%) of the sales price. Said commission will be paid at closing.

"\* \* \*

"6. Should the stock of Somerset Oil, Inc. be sold within 18 months of the termination of this agreement to a Buyer previously introduced by Broker to the Shareholders, Broker shall be entitled to its 5% commission."

 Under Kentucky law, the construction of a contract is generally a matter of law for a court to decide.[4] While it may be necessary for a jury to construe the meaning of a contract when extrinsic evidence is required for interpretation,[5] in the absence of ambiguity, fraud, or mistake, a court must construe a contract according to its express terms.[6] We hold that there was no ambiguity in this case and uphold the trial court's interpretation of the brokerage contract's plain meaning.

 It is undisputed that the sale of stock to the buyer and the redemption of the remaining shares occurred within eighteen months of the termination of the brokerage contract. So paragraph six controlled the amount of commission due DLC. Under paragraph six, DLC was to have received a commission in the amount of five percent for the sale of Somerset stock "to a Buyer previously introduced by Broker to the Shareholders." The particular buyer procured by DLC bought only a portion of Somerset, and that was the only portion upon which DLC was entitled to a commission.

Similarly, DLC would not have been entitled to an enhanced commission based on a combined sale price had a purchaser procured by DLC acquired only part of Somerset and an unrelated purchaser acquired another part. Nor would DLC have been entitled to a greater commission if the shareholders had simply partitioned the company in preparation for a sale by distributing a dividend and then selling all of their shares to DLC's buyer for an amount reflective of the diminished asset value of the company.

---

**4.** See *Morganfield Natl. Bank v. Damien Elder & Sons* (Ky.1992), 836 S.W.2d 893, 895, citing *Equitable Life Assurance Soc. of the United States v. Wells* (C.A.6, 1939), 101 F.2d 608.

**5.** See *Cook United, Inc. v. Waits* (Ky.1974), 512 S.W.2d 493, 495.

**6.** See *G.T. O'Bryan v. Massey–Ferguson, Inc.* (Ky.App.1966), 413 S.W.2d 891, 893; *Johnson v. Edwards* (App.1929), 230 Ky. 485, 20 S.W.2d 76, 77, quoting *Stevenson v. Phoenix Ins. Co.* (App.1884), 83 Ky. 7, 1884 WL 7404.

The contract plainly allocated a commission only for the price that DLC's buyer paid for Somerset stock. To earn a greater commission under the contract, DLC would have had to have procured a buyer that paid more for Somerset stock, presumably by purchasing more of the company's assets. Any other interpretation ignores the plain language of the contract. DLC's first assignment of error is overruled.

Having determined that DLC was entitled to compensation only for what its buyer actually acquired, we must now determine whether that amount was the initial $5,700,000 purchase price stated in the stock purchase agreement before closing or the $4,800,000 derived from the adjustment after closing. DLC argues that because the contract stated that the commission was payable at closing, no further modification of the sales price and corresponding adjustment to DLC's commission were permitted.

DLC cites a case for this proposition in which a real estate broker procured a buyer who entered into a binding contract that the seller later sought to repudiate.[7] The court held that where there is a binding contract enforceable by the seller, the broker has earned his commission, and "it is irrelevant whether the purchaser is ready, willing and able to perform or whether either party refuses to perform."[8]

The difference between that case and the one now before us is readily apparent. Here, the sales price stated in the binding contract was, according to its terms, specifically subject to adjustment. The contract was, therefore, not necessarily enforceable by the shareholders at the stated price. DLC was entitled to a commission only to the extent that the stock purchase agreement was enforceable against the buyer. Thus, as the trial court ruled, DLC was entitled to a commission on the adjusted sales price only. DLC's second and final assignment of error is overruled, and the trial court's judgment is affirmed.

*Judgment affirmed.*

DOAN, P.J., and PAINTER and WINKLER, JJ., concur.

---

7. See *Neel v. Wagner Shuck Realty Co.* (Ky.App.1978), 576 S.W.2d 246.

8. *Id.* at 249.