[Cite as *Lawarre v. Fifth Third Secs., Inc.*, 2012-Ohio-4016.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| WILLIAM LAWARRE, | : | APPEAL NO. C-110302 |
| | | TRIAL NO. A-0909076 |
| JOHN PAPA, | : | |
| | | *O P I N I O N.* |
| EAGLE FLIGHT INVESTMENTS, INC., | : | |
| | : | |
| PROPERTY ASSET MANAGEMENT, LTD., | : | |
| | : | |
| and | : | |
| LAJ, INC., | : | |
| Plaintiffs-Appellants, | : | |
| vs. | : | |
| FIFTH THIRD SECURITIES, INC., | : | |
| and | : | |
| FIFTH THIRD BANK, | : | |
| Defendants-Appellees. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 5, 2012

*Santen & Hughes, Charles E. Reynolds, J. Robert Linneman* and *Brian P. O'Connor*, for Plaintiffs-Appellants,

*Keating, Muething & Klekamp, PLL, James E. Burke* and *Joseph M. Callow, Jr.*, for Defendants-Appellees.

Please note: This case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1} Plaintiffs-appellants William LaWarre, John Papa, Eagle Flight Investments, Inc., Property Asset Management, LTD, and LAJ, Inc., appeal the decision of the Hamilton County Court of Common Pleas granting summary judgment in favor of defendants-appellees Fifth Third Securities, Inc., and Fifth Third Bank. We find no merit in their assignments of error, and we affirm the trial court's judgment.

### I. Facts and Procedure

{¶2} The record shows that LaWarre and Papa were customers of Fifth Third Bank and Fifth Third Securities. Papa was the sole owner of plaintiffs-appellants Eagle Flight Investments, Inc., Property Asset Management, Ltd., and LAJ, Inc. These companies were not operating business entities, but passive vehicles through which Papa held investment funds. Consequently, we refer to them collectively as "Papa," where appropriate.

{¶3} Fifth Third Bank and Fifth Third Securities were separate corporations, but they operated together informally as Fifth Third Financial Advisors. They shared certain employees, including Dan Hughes, Kathy Collins, and Jana Sturgeon. Consequently, we refer to them collectively as "Fifth Third" where appropriate.

{¶4} Collins was LaWarre's private banker at Fifth Third Bank and Sturgeon was Papa's. In 2006, Collins and Sturgeon introduced their clients to Hughes, who was an investment advisor at Fifth Third Securities. Hughes recommended that LaWarre and Papa invest their money in options trading. Both Papa and LaWarre met with Hughes before agreeing to invest their funds with him.

They both signed applications and other documents, which contained disclaimers describing the risks of options trading. The disclaimers stated:

> I specifically affirm the following disclosures
>
> * * *
>
> That both the purchase and the writing of options contracts involve a high degree of risk, are not suitable for many investors and, accordingly, should be entered into only by investors who understand the nature and extent of their rights and obligations and are fully aware of the inherent risk involved, especially during extreme market volatility or trading volumes.
>
> That I should not purchase any option unless I am able to sustain a total loss of the premium and transaction costs * * *.

{¶5} Both LaWarre and Papa made substantial returns on their investments in 2007 while Hughes was trading for Fifth Third. LaWarre stated that he had had no problems with Hughes during the time that Hughes had been trading for Fifth Third. Papa also testified in his deposition that he had been comfortable with the trading activity by Hughes during that time.

{¶6} Fifth Third became concerned about the risk involved with Hughes's trading strategy. It became a subject of ongoing review by his supervisors. Eventually, Fifth Third imposed a six-month supervisory restriction on Hughes and all of his clients' accounts. Any transactions he undertook were the subject of special scrutiny. Eventually, Fifth Third's legal-compliance department approved Hughes's

option-trading strategies for use in his clients' accounts and released him from the supervisory restriction.

{¶7} Subsequently, Fifth Third proposed to change the fee structure of Hughes's clients' accounts. The change would have resulted in large increases in the fees charged to his clients, which Hughes believed would adversely affect his ability to retain and serve his clients. As a result, in September 2007, he left Fifth Third and began working at a new firm, Fosset Hughes and Jabin Investments ("FHJ").

{¶8} Fifth Third met with LaWarre and Papa and presented them with alternative investment strategies, in an attempt to keep their business. But both of them voluntarily transferred their investment accounts to FHJ so that they could continue investing with Hughes. After that time, LaWarre and Papa did not receive any further investment advice from Fifth Third.

{¶9} While their accounts were at FHJ, LaWarre and Papa suffered substantial losses, totaling millions of dollars. For a while, Hughes sought to conceal the losses by falsifying monthly account statements. Eventually, Hughes told his clients about the losses. LaWarre continued to work with Hughes, who developed a new investment strategy in early 2008 in an attempt to limit LaWarre's losses. Nevertheless, LaWarre continued to lose money. LaWarre lost over $6 million and Papa lost over $2 million.

{¶10} LaWarre and Papa filed suit against Fifth Third, raising numerous causes of action that included negligence, breach of fiduciary duty, and fraud. The trial court granted summary judgment in favor of Fifth Third on all of LaWarre's and Papa's claims based primarily on its analysis of *Herbert v. Banc One Brokerage Corp.*, 93 Ohio App.3d 271, 638 N.E.2d 161 (1st Dist.1994). This appeal followed.

## *II. Tort Claims*

{¶11}   LaWarre and Papa each assert a single assignment of error.  They contend that the trial court erred in granting summary judgment in favor of Fifth Third.  First, they argue that the trial court improperly granted judgment on their tort claims based on an unwarranted extension of dicta in *Herbert.*  We find no merit in this argument.

{¶12}   LaWarre and Papa raised several tort claims against Fifth Third. They included negligence in the giving of investment advice, negligent misrepresentation, and negligent supervision.  The elements of any negligence claim are duty, a breach of that duty, and injury proximately resulting from that breach. *Menifee v. Ohio Welding Products, Inc.*, 15 Ohio St.3d 75, 76, 472 N.E.2d 707 (1984); *Vonderhaar v. Cincinnati*, 191 Ohio App.3d 229, 2010-Ohio-6289, 945 N.E.2d 603, ¶ 19 (1st Dist.).

{¶13}   LaWarre and Papa also set forth claims for breach of fiduciary duty. A fiduciary is "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected to his undertaking."  *Groob v. Keybank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 16; *Health Alliance of Greater Cincinnati v. Christ Hosp.*, 1st Dist. No. C-070426, 2008-Ohio-4981, ¶ 20. A fiduciary relationship is "a relationship in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."  *Groob* at ¶ 16; *Health Alliance* at ¶ 20.  A broker or financial advisor has a fiduciary relationship with his clients.  *Mathias v. Rosser*, 10th Dist. Nos. 01AP-768 and 01AP-770, 2002-Ohio-2772, ¶ 18; *Byrley v. Nationwide Life Ins. Co.*, 94 Ohio App.3d 1, 18, 640 N.E.2d 187 (6th Dist.1994).

{¶14}   In *Herbert*, the case relied upon by the trial court, the plaintiffs were customers of Bank One.  The bank had a business relationship with Banc One Brokerage Corporation in which the brokerage rented space in one of the bank's offices and the bank referred customers to the brokerage.

{¶15}   The brokerage employed Randall Clark as a securities salesperson. The bank's employees referred customers to Clark, who sold investment securities, life insurance, and annuities to the bank's customers, including the plaintiffs.  The bank made financial information about its customers available to Clark without the customers' consent.  It did not disclose to customers that Clark was not its employee.

{¶16}   While employed by the brokerage, Clark developed a relationship with Harry Fleischhauer, who was engaged in a scheme to sell unregistered and worthless securities to investors.  Clark began referring investors to Fleischhauer, and eventually left the brokerage to work for him.  Clark used the bank's customer lists to solicit investors.  Some of the bank's depositors brought letters that they had received from Clark to the bank's and the brokerage's attention.  But bank and the brokerage did nothing to warn their customers about the bad investments.  Clark sold worthless securities to the plaintiffs and they lost the funds that they had invested.

{¶17}   The plaintiffs filed suit against the bank and the brokerage for negligence and breach of fiduciary duty alleging that they had failed to protect the plaintiffs or to notify them about the sale of the worthless securities.  The trial court granted the defendants' motion to dismiss the complaint because it had been filed outside the statutory limitations period and because it had failed to state a claim upon which relief could be granted under Civ.R. 12(B)(6).  While we held that the trial court properly dismissed the complaint because it had been filed outside the

limitations period, we also addressed the merits of the trial court's decision to dismiss the case for failure to state a claim.

{¶18}   We noted that ordinarily no duty exists to prevent a third person from causing harm to another, except in cases where a special relationship exists between the actor and the third person that gives rise to a duty to control, or between the actor and another that gives the other the right to protection. *Herbert*, 93 Ohio App.3d at 276, 638 N.E.2d 161.  Thus, there is no liability in the absence of a special duty owed by a particular defendant. *Id.* "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Id.* at 277, 638 N.E.2d 161, quoting *Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 39-40, 521 N.E.2d 780 (1988).

{¶19}   We stated that "[a] principal is not liable for the actions of its agent unless done while engaged in duties within the scope of his employment.  Brokerage owed no duty to [the plaintiffs] to protect them as to transactions with Clark following his departure from Brokerage." (Citations omitted.)  *Herbert*, 93 Ohio App.3d at 278, 638 N.E.2d 161.

{¶20}   The same logic applies in this case.  We agree with the trial court that:

> Plaintiffs voluntarily transferred their investment accounts to a new firm.  Both wanted to follow their broker to his new firm because they liked Mr. Hughes' strategy and both were making money.  They suffered no losses while at Fifth Third and voluntarily allowed Mr. Hughes to trade options on their behalf.  When Mr. Hughes left Fifth Third, they could have kept their

7

investments with Fifth Third but decided to transfer their accounts to FHJ. Unfortunately, they ultimately suffered substantial losses while at FHJ. However, Fifth Third cannot be held responsible for losses sustained after Plaintiffs had left Fifth Third.

{¶21} Simply put, once Hughes had left Fifth Third, and LaWarre and Papa had transferred their investments to Hughes's new firm, Fifth Third no longer owed them a duty. Therefore, it could not, as a matter of law, be held liable for negligence or breach of fiduciary duty for Hughes's conduct after he had left Fifth Third.

{¶22} LaWarre and Papa argue that even if Fifth Third was not responsible for Hughes's conduct after he left Fifth Third, they were responsible for what he had done while he worked there. They presented evidence that while Hughes was at Fifth Third, his superiors took issue with his risky investment strategies. Both LaWarre and Papa testified that they had trusted their initial contacts at Fifth Third and they had trusted Hughes. They stated that if Fifth Third had disclosed to them its concerns about Hughes's strategy, they might not have trusted Hughes so implicitly. They argue that if they had understood the substantial amount of risk involved and the concept that losses were inevitable, they might not have followed Hughes to his new employer and might have stayed with Fifth Third.

{¶23} But Fifth Third had warned both LaWarre and Papa that options trading was risky in general. The disclaimer in the documents they both signed specifically stated that options trading involved a "high degree of risk." They did not suffer any losses while Hughes was employed at Fifth Third. They voluntarily transferred their accounts to Hughes's new firm, despite the fact that Fifth Third tried to convince them to keep their investments with Fifth Third. Fifth Third's

employees called both LaWarre and Papa and discussed the risks of options trading. They offered to help them with alternative investment strategies that involved less risk, but less return. LaWarre and Papa turned down their offers, and did not seek any investment advice from Fifth Third after September 2007. They signed new disclosure agreements with FHJ and agreed to continue to invest in options trading in 2008 and 2009. They did not sustain losses until 2008 and 2009, when Hughes was employed at FHJ.

{¶24} The record shows that Fifth Third met its initial burden to affirmatively demonstrate that its conduct did not cause LaWarre and Papa harm. *See Gedra v. Dallmer Co.*, 153 Ohio St. 258, 91 N.E.2d 256 (1950), paragraphs one and three of the syllabus; *Cipollone v. Hoffmeier*, 1st Dist. No. C-060482, 2007-Ohio-3788, ¶ 24. LaWarre and Papa failed to meet their reciprocal burden to set forth specific facts showing that a genuine issue of material fact existed for trial. *See Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996); *Stinespring v. Natorp Garden Stores*, 127 Ohio App.3d 213, 216, 711 N.E.2d 1104 (1st Dist.1998).

{¶25} We find no material issue of fact. Construing the evidence most strongly in LaWarre's and Papa's favor, we hold that reasonable minds can come to but one conclusion—that any breach of duty by Fifth Third did not cause harm to LaWarre and Papa. Fifth Third was entitled to judgment as a matter of law on their negligence and breach-of-fiduciary-duty claims, and the trial court did not err in granting summary judgment in Fifth Third's favor on those claims. *See Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Greene v. Whiteside*, 181 Ohio App. 3d 253, 2009-Ohio-741, 908 N.E.2d 975, ¶ 23 (1st Dist.); *Stinespring* at 215.

### III. Breach of Contract

{¶26}  Next, LaWarre and Papa argue that the trial court erred in granting summary judgment in favor of Fifth Third on their breach-of-contract claims.  They argue that *Herbert* does not control contract claims, and that Fifth Third breached the contract by recommending unsuitable investments and failing to warn them about the risks of Hughes's investment scheme.  They also argue that Fifth Third breached its obligation to act in good faith.  While we agree that *Herbert*, which involved tort claims, does not control the instant contract claims, we find no merit in their other arguments.

{¶27}  We first note that the option account agreement specifies that "[t]his Agreement and its enforcement shall be governed by the laws of the Commonwealth of Massachusetts[.]"  Because the parties made an effective choice of law in the agreement, we apply Massachusetts law in interpreting it.  *See Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St.3d 436, 453 N.E.2d 683 (1983), syllabus; *Dubuc Lucke & Co., Inc. v. Walker*, 143 Ohio App.3d 595, 598, 758 N.E.2d 738 (1st Dist.2001).

{¶28}  The interpretation of a written instrument is a question of law for the court, which will enforce unambiguous language according to its terms.  *Cody v. Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146, 439 N.E.2d 234 (1982); *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970).  Contracts are to be construed "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed."  *Cody* at 146, quoting *MacArthur v. Massachusetts Hosp. Serv., Inc.*, 343 Mass. 670, 672, 180 N.E.2d 449 (1962).  But courts must construe ambiguous language to give effect to the parties' probable intent.  *Massachusetts Mun. Wholesale Elec. Co. v. Danvers*, 411 Mass. 39,

45-46, 577 N.E.2d 283 (1991); *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 795, 494 N.E.2d 374 (1986); *Janeczek v. Heavey*, Middlesex Sup.Ct. No. 88-6694, 1992 Mass.Super. LEXIS 1, *6.

{¶29} Courts must construe a contract to give reasonable effect to all of its provisions. *J.A. Sullivan Corp.* at 795. "[E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties." *Id.*, quoting *Charles I. Hosmer, Inc. v. Commonwealth*, 302 Mass. 495, 501, 19 N.E.2d 800 (1939).

{¶30} To prevail on a breach-of-contract claim, a party must demonstrate by a preponderance of the evidence: (1) that the parties reached a valid and binding agreement; (2) that the defendants breached the terms of that agreement; and (3) that the nonbreaching party suffered damages as a result of the breach of contract. *Towner v. Bennington Constr. Co., Inc.*, Plymouth Sup.Ct. No. 90724, 2005 Mass.Super. LEXIS 534, *30, citing *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir.1999). Summary judgment is appropriate in breach-of-contract cases because the court may interpret the meaning of the contract as a matter of law. *New England Power Co. v. Norwood*, Worcester Sup.Ct. No. 98-2650A, 2001 Mass.Super. LEXIS 89, *30-31, citing *ER Holdings, Inc. v. Norton Co.*, 735 F.Supp. 1094, 1097 (D.Mass.1990).

{¶31} The record does not demonstrate that Fifth Third failed to perform an essential contractual obligation. *See Marks v. Southcoast Hosp. Groups, Inc.*, 29 Mass.L.Rep. 277, 2011 Mass.Super. LEXIS 325, *37 (Plymouth Sup.Ct.2011). The contract contains unambiguous language specifically warning LaWarre and Papa

11

about the risks of options trading. Both LaWarre and Papa were sophisticated investors and had relatively equal bargaining power with Fifth Third. *See Harris v. McIntyre*, Suffolk Sup.Ct. No. 94-3597-H, 2000 Mass.Super. LEXIS 181, *30. By signing the contract, they acknowledged that they were "fully aware" of the risks.

{¶32} Further, the record does not demonstrate that they incurred damages as the result of Fifth Third's failure to perform any of its obligations under the contract. To establish a prima facie case of breach of contract, a party must show that he suffered damages as a result of the other party's breach of contract. *Kilgallon v. Clear Channel Communications, Inc.*, 23 Mass.L.Rep. 75, 2007 Mass.Super. LEXIS 371, *11 (Norfolk Sup.Ct.2007).

{¶33} The undisputed facts show that LaWarre and Papa made money from their investments while they invested with Hughes at Fifth Third. They voluntarily followed Hughes to his new firm even though Fifth Third tried to persuade them to stay with Fifth Third and put their money in safer investments. LaWarre and Papa lost money only after they had taken their investments out of Fifth Third, and Fifth Third had no control over what occurred.

{¶34} LaWarre and Papa also argue that that Fifth Third violated its duty to act in good faith. Every contract contains an implied duty of good faith and fair dealing. *Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 473, 583 N.E.2d 806 (1991); *Owen v. Kessler*, 56 Mass.App.Ct. 466, 471, 778 N.E.2d 953 (2002). Good faith performance or enforcement of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Tufankjian v. Rockland Trust Co.*, 57 Mass.App.Ct. 173, 177, 782 N.E.2d 1 (2003). "The implied covenant of good faith and fair dealing provides that 'neither party shall do anything that will have the effect of destroying or injuring the right of

the other party to receive the fruits of the contract[.]' " *Anthony's Pier Four* at 471-472, quoting *Druker v. Roland Wm. Jutras Assoc., Inc.*, 370 Mass. 383, 385, 348 N.E.2d 763 (1976).

{¶35} A violation of this covenant usually requires more than a simple breach of contract. *Targus Group Internatl., Inc. v. Sherman*, 76 Mass.App.Ct. 421, 435, 922 N.E.2d 841 (2010). Usually, a breach of the covenant involves bad-faith conduct "implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of fraud." *Id.*, quoting *Equip. & Sys. for Industry, Inc. v. Northmeadows Constr. Co.*, 59 Mass.App.Ct. 931, 932-933, 798 N.E.2d 571 (2003). The covenant is limited in scope and cannot create rights and duties not otherwise provided for in the contract. *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957 (2004); *McQueen v. True Partners Consulting, LLC*, 28 Mass. L.Rep. 411, 2011 Mass.Super. LEXIS 108, *23 (Norfolk Sup.Ct.2011).

{¶36} The record shows that Fifth Third did not violate its duty of good faith. The contract language specifically warned LaWarre and Papa that options trading was risky and that they could lose their investment. By signing the contracts, they affirmed that they understood the risks involved. Further, since the contract specifically set forth the dangers of options trading, LaWarre and Papa cannot contradict the plain language of the contract by arguing that Fifth Third failed to act in good faith.

{¶37} We find no issues of material fact. Construing the evidence most strongly in LaWarre's and Papa's favor, we hold that reasonable minds can come to but one conclusion—that Fifth Third did not breach the contract and that it's conduct did not cause injury to LaWarre and Papa. Fifth Third was entitled to judgment as a matter of law on the breach-of-contract claims, and the trial court did not err in

granting summary judgment in Fifth Third's favor on those claims. *See Temple*, 50 Ohio St.2d at 327, 364 N.E.2d 267; *Greene*, 181 Ohio App. 3d 253, 2009-Ohio-741, 908 N.E.2d 975, at ¶ 23; *Stinespring*, 127 Ohio App.3d at 215, 711 N.E.2d 1104.

### IV. Statutory Claims

{¶38}   LaWarre and Papa argue that the trial court erred in dismissing their claims based on Ohio and Kentucky securities laws. They argue that *Herbert* is not dispositive of those claims, and that Fifth Third failed to meet its initial burden to show that it was entitled to summary judgment on those issues.

{¶39}   The Ohio Securities Act, which is generally referred to as the Ohio Blue Sky Law, was adopted to prevent the fraudulent exploitation of the investing public through the sale of securities. *In Re Columbus Skyline Securities, Inc.*, 74 Ohio St.3d 495, 498, 660 N.E.2d 427 (1996). LaWarre and Papa rely on provisions of the Ohio and Kentucky statutes that prohibit fraud or fraudulent nondisclosure. *See* R.C. 1707.44(B), (G) and (M); Ky.Rev.Stat.Ann. 292.320(1) and (2).

{¶40}   R.C. 1707.01(J) states:

> "Fraud," "fraudulent," "fraudulent acts," "fraudulent practices," or "fraudulent transactions" means anything recognized on or after July 22, 1929, as such in courts of law or equity; any device, scheme, or artifice to defraud, or to obtain money or property by means of any false pretense, representation, or promise; any fictitious or pretended purchase or sale of securities; and any act, practice, transaction or course of business relating to the purchase or sale of securities that is fraudulent or that

has operated or would operate as a fraud upon the seller

or purchaser.

{¶41} The statute indicates that that the definition of fraud is to be derived from case law. *Columbus Skyline Securities* at 498. Fraud is "a knowing misrepresentation of the truth * * * to induce another to act for his or her detriment." *Curran v. Vincent*, 175 Ohio App.3d 146, 2007-Ohio-3680, 885 N.E.2d 964, ¶ 18 (1st Dist.) The elements of civil fraud are (1) a misrepresentation, (2) material to the transaction, (3) made falsely, knowingly, or recklessly, (4) with the intention of misleading another into a justifiable reliance on those facts, (5) that causes the other party injury. *Burr v. Bd. of Cty. Commrs. of Stark Cty.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986), paragraph two of the syllabus; *Curran* at ¶ 18.

{¶42} Fifth Third sustained its initial burden to show that it did not commit fraud. It specifically warned LaWarre and Papa of the inherent risks of options trading. LaWarre and Papa failed to meet their reciprocal burden to show that they justifiably relied on any misrepresentation by Fifth Third or that any misrepresentation by Fifth Third caused them injury. The bottom line is that both of them earned money on their investments while Hughes was at Fifth Third. It was not until after he left to join another firm that LaWarre and Papa sustained financial losses.

{¶43} As to a claim of fraudulent nondisclosure, the rule in *Herbert* applies. Once Hughes had left Fifth Third and LaWarre and Papa were no longer its clients, it no longer had a duty to disclose. *See Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988); *Gator Dev. Corp. v. VHH, Ltd.*, 1st Dist. No. C-080193, 2009-Ohio-1802, ¶ 28; *Herbert*, 93 Ohio App.3d at 277-278, 638 N.E.2d 161.

15

{¶44} Before Hughes left Fifth Third, a fiduciary relationship existed and Fifth Third had a duty to disclose. *See Blon* at 101; *Gator Dev. Corp.* at ¶ 28. We have already held that Fifth Third did not violate that duty to disclose. But even if it had, the record does not show that LaWarre or Papa changed their position in reliance on any omission, or that they suffered any resulting injury from an omission, both necessary elements of a fraudulent-nondisclosure claim. *Gator Dev. Corp.* at ¶ 28-29.

{¶45} Kentucky law is similar to Ohio law in that violations of its Blue Sky Law require a showing of a material misrepresentation or omission, and economic loss caused by the omission or misrepresentation. *See Brown v. Earthboard Sports USA*, 481 F.3d 901, 916-917 (6th Cir.2007); *Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 707 F.Supp. 702, 714 (W.Dist.Ky.2010). Moreover, the misrepresentation or omission must pertain to material information that the defendant had a duty to disclose. *Ashland Inc. v. Oppenheimer*, 648 F.3d 461, 468 and 471 (6th Cir.2011). Therefore, we reach the same result on LaWarre's and Papa's claims under Kentucky law.

{¶46} We find no issue of material fact. Construing the evidence most strongly in Papa's and LaWarre's favor, we hold that reasonable minds could only reach one conclusion—that Fifth Third did not act fraudulently, and, therefore, it did not violate Ohio's or Kentucky's securities laws. Consequently Fifth Third was entitled to judgment as a matter of law on LaWarre's and Papa's statutory claims, and the trial court did not err in granting Fifth Third's motions for summary judgment as to those claims. *See Temple,* 50 Ohio St.2d at 327, 364 N.E.2d 267; *Greene*, 181 Ohio App.3d 253, 2009-Ohio-741, 908 N.E.2d 975, at ¶ 23; *Stinespring*, 107 Ohio App.3d at 215, 711 N.E.2d 1104.

### V. Claims against Fifth Third related to Collins's Conduct

{¶47} LaWarre separately alleged claims for breach of an oral contract, breach of fiduciary duty, negligence, and promissory estoppel against Fifth Third related to the conduct of Fifth Third's employee Kathy Collins. LaWarre claimed that after Hughes had left Fifth Third and he had followed Hughes to the new firm, he had asked Collins to review his financial statements from Hughes when LaWarre was in California on business. The undisputed evidence showed that Collins only confirmed the account balances on the statements. Collins acknowledged that she did not understand options trading or the specifics of the items reported in the statements.

{¶48} Collins had been LaWarre's personal banker. When he took his investment accounts to FHJ, Fifth Third remained his bank, but it no longer gave him investment advice. At that point, the relationship between Collins and LaWarre was that of banker and customer. It was not a fiduciary relationship and Collins owed him no fiduciary duty. *See Groob*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170 at ¶ 16-26; *Five Star Fin. Corp. v. Merchant's Bank & Trust Co.*, 192 Ohio App.3d 544, 2011-Ohio-314, 949 N.E.2d 1016, ¶ 30-31 (1st Dist.). Therefore, LaWarre's claim for breach of fiduciary duty fails as a matter of law.

{¶49} As to LaWarre's claim for breach of an oral contract, a meeting of the minds is an essential prerequisite to the enforcement of an oral contract. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16; *Blair v. McDonagh,* 171 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶ 55 (1st Dist.). The terms of a contract may be determined from the "words, deeds, acts, and silence of the parties." *Blair* at ¶ 55, quoting *Kostelnik* at ¶ 15. LaWarre acknowledged that he did not rely on Collins to review the entire statement or to understand and advise

him regarding his investments. During the time he was in California, he talked with Hughes on a daily basis about his investments.

{¶50} Where the facts are undisputed and the only question to be resolved is whether a breach of contract occurred, a question of law exists for the court to decide. *Id.*; *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 77 (6th Dist.). The undisputed facts in the record show that the scope of the agreement was that Collins would inform LaWarre of the account balances and nothing more. She fulfilled her obligations under the contract, and, therefore, no breach of that contract occurred. *See Stephen Bus. Ent. v. Lamar Outdoor Advertising Co.*, 1st Dist. No. C-070373, 2008-Ohio-954, ¶ 16.

{¶51} LaWarre has also raised a negligence claim against Fifth Third related to Collins's conduct in which he contended that she was negligent in failing to diligently review the statements and in failing to report their contents to him. But this argument centers upon her agreement to review the documents. Therefore, any negligence claim is barred by the economic-loss doctrine.

{¶52} The economic-loss doctrine prevents recovery of damages in tort for purely economic loss. *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6; *Eysoldt v. Proscan Imaging, Inc.*, 194 Ohio App.3d 630, 2011-Ohio-2359, 957 N.E.2d 780, ¶ 19 (1st Dist.). "Tort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Corporex Dev.* at ¶ 6, quoting *Floor Craft Floor Covering, Inc. v. Parma Comm. Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 7, 560 N.E.2d 206 (1990).

{¶53} Further, even if Collins, as Fifth Third's employee, had owed LaWarre a duty, it was only to inform him of the account balances. Therefore, no breach of

that duty occurred, and LaWarre's negligence claim against Fifth Third related to Collins's conduct fails as a matter of law. *See Menifee*, 15 Ohio St.3d at 76, 472 N.E.2d 707; *Hill*, 36 Ohio St.3d at 39-40, 521 N.E.2d 780; *Herbert*, 93 Ohio App.3d at 276-277, 638 N.E.2d 161.

{¶54} Finally, LaWarre raised a promissory-estoppel claim against Fifth Third based on Collins's conduct. The elements of promissory estoppel are (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of the reliance on the promise. *Weiper v. W.A. Hill & Assoc., Inc.*, 104 Ohio App.3d 250, 260, 661 N.E.2d 796 (1st Dist.1995). "While the making, keeping and relying upon of alleged promises are factual issues, typically for the jury, a court may deem certain circumstances objectively unreasonable, as when it finds that 'reasonable minds could come to but one conclusion.' " *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-980, 2006-Ohio-638, ¶ 105, quoting *Telxon Corp. v. Smart Media of Delaware, Inc.*, 9th Dist. Nos. 22098 and 22099, 2005-Ohio-4931, ¶ 59.

{¶55} In this case, LaWarre simply did not rely on Collins to do anything other than provide him with the balances on the statements. Again, he stated that he did not rely on Collins to review the entire document or to understand and advise him about his investments. In fact, he talked with Hughes on a daily basis about his investments. Further, any reliance on her review of the statements would not have been reasonable given her admission that she did not understand options trading or the specifics of the statements. *See Heinz & Assoc., Inc. v Diamond Cellar Holdings, LLC*, 10th Dist. No. 11AP-688, 2012-Ohio-1422, ¶ 21. Therefore, no material issues

of fact exist for trial, and the trial court did not err in granting summary judgment in favor of Fifth Third on LaWarre's separate claims regarding Collins's conduct.

### VI. Summary

{¶56}   In sum, we hold that the trial court did not err in granting summary judgment in favor of Fifth Third on all of LaWarre's and Papa's claims.  We overrule the assignments of error and affirm the trial court's judgment in all respects.

Judgment affirmed.

SUNDERMANN, P.J., concurs.
CUNNINGHAM, J., concurs in part and dissents in part.

CUNNINGHAM, J., concurring in part and dissenting in part.

{¶57}   I concur in the majority's decision to the extent that it affirms summary judgment for Fifth Third Securities and Fifth Third Bank on LaWarre's separate negligence claim based on Kathy Collins's conduct with respect to his Fidelity investment account statements.  That claim is barred by the economic loss doctrine.  But, for the reasons that follow, I dissent from the majority's decision affirming summary judgment on the other claims.

{¶58}   At the summary judgment stage of the proceedings, we must view the evidence in the light most favorable to the nonmovants, here William LaWarre and John Papa.  Accordingly, I have summarized the salient facts, as supported by the record.

### I. Background Facts

{¶59}   In late 2004, LaWarre was introduced by Collins, a private banker in Fifth Third's Investment Advisor Group, to Dan Hughes, an investment advisor and registered representative in the same group.  In 2006, Jana Sturgeon, another private banker in the same group, introduced Papa to Hughes.  All of these

Investment Advisor Group employees were dually employed by Fifth Third Bank and Fifth Third Securities. They also shared a supervisor, Steve Brown, and the branch office in Northern Kentucky.

{¶60} Collins had been LaWarre's private banker for over 20 years. Sturgeon had been Papa's employee for many years before becoming his private banker.

{¶61} LaWarre and Papa subsequently opened investment accounts at Fifth Third Securities with Hughes as their investment advisor. Evidence in the record indicates that Collins and Sturgeon were eligible for compensation for successful referrals to Fifth Third Securities that varied according to the size and profitability of the referral.

{¶62} Although the options contract that LaWarre and Papa had signed generally disclosed the high risks of options trading, LaWarre and Papa asserted that they had proceeded with Hughes's specific options trading strategy based on representations from the Investment Advisor Group employees that the strategy was a "low-risk" investment course that did not expose significant investment principal to loss.

{¶63} According to Papa, Hughes had specifically told him that he had researched the fluctuation of the Standard & Poor's 500 index ("S & P") for the past 40 years, 35 more than Fifth Third required, and that based on this research, his "trades" would have failed only six times in those 40 years.

{¶64} LaWarre and Papa claimed they told Hughes that their principal had to be protected. Papa specified that no more than five percent of his principal could be at risk. Hughes allegedly told both Papa and LaWarre that if the "trades" failed in a particular month, the trades could be rolled over to the next month. As a result, in

the worst case, they would get their principal back but would not make the one-to-three percent "interest" for two months.

{¶65} LaWarre and Papa both claimed that they had not read the options contract or filled in any of the requisite information before signing it because of their trust in the Investment Advisor Group employees, particularly their private bankers, and the rushed way that the contracts had been presented to them. They claimed these employees had provided the necessary information on the forms, including their acceptable risk levels.

{¶66} Allegedly at the recommendation of the Investment Advisor Group employees, Papa funded the investment strategy with a home-equity line from Fifth Third Bank, and LaWarre used Hughes's options strategy to fund the purchase and renovation of homes with multimillion dollar loans from Fifth Third Bank. According to LaWarre, Hughes promised that the strategy would provide sufficient monthly cash flow for him to repay his loans to Fifth Third Bank. These loans included a $3.7 million mortgage, obtained in December 2004, to purchase property in Montecito, California; a $1 million line-of-credit for improvements, suggested by Collins; a $7 million residential mortgage, obtained in February 2006, to purchase another property in California; and a $4.25 million line of credit that Fifth Third Bank renewed in February 2007. The bank knew that LaWarre was relying on income from Hughes's strategy to stay current on these loans.

{¶67} While employed by Fifth Third Securities, Hughes allegedly exercised discretionary control over Papa's and LaWarre's investment accounts. Both Papa and LaWarre averred that Hughes executed transactions in their accounts without first obtaining their approval.

{¶68} Hughes was immediately supervised by Stephen Brown and Steve Sherline, but these supervisors testified at their depositions that they did not understand the options strategy employed by Hughes. They also testified that one factor concerning the suitability of an investment is the source of the investment funds. But neither knew that Papa was funding the strategy with hundreds of thousands of dollars of liquified home equity.

{¶69} In the fall of 2006, Hughes was placed on heightened supervision while employed by Fifth Third, in part because the timing of his trades raised concerns. Sherline was aware that Hughes had also been placed on heightened supervision with Fifth Third Securities in 2003. According to Hughes, Fifth Third imposed the heightened supervision in 2006 due to Fifth Third's concern over the use of the options strategy. Sherline had weekly discussions with Hughes about the risks associated with the strategy and felt that Hughes did not have a method to avoid losses during periods of market volatility.

{¶70} Sherline testified at his deposition that he would personally discuss with clients large losses under the protocol of Fifth Third Securities. However, at about the time that Hughes was removed from heightened supervision in the spring of 2007, LaWarre lost over one million dollars in his options trading account, and Sherline did not discuss the loss with him.

{¶71} At least some evidence indicates that when Fifth Third Securities finally appreciated the enormous risks presented by the options strategy Hughes employed—the financial equivalent of "picking up pennies in front of a steamroller"—it gave Hughes the choice to abandon the strategy or leave his job. Hughes chose to leave.

{¶72} At Hughes's exit interview, Sherline told Hughes that his options strategy would one day cause huge losses of clients' funds. Additionally, he told Hughes that his strategy required the multiple layers of supervision provided by Fifth Third Securities but that Hughes would not receive at his new firm.

{¶73} Neither Fifth Third Securities nor Fifth Third Bank disclosed to Papa or LaWarre any of this information, including the existence and circumstances of the heightened supervision or the reason why their employment relationship with Hughes was severed.

{¶74} LaWarre and Papa followed Hughes to his new investment advisory firm, where their investments were held in security accounts with Fidelity Brokerage Services ("Fidelity"). Papa claimed that Sturgeon encouraged him to follow Hughes because she considered Hughes to be "the best."

{¶75} Shortly after LaWarre and Papa moved their investment accounts from Fifth Third Securities, Steve Seidl, an investment advisor at Fifth Third Securities, contacted them and attempted to bring them back. Seidl testified at his deposition that he had offered to execute, with Sherline's approval, the same options strategy employed by Hughes, even though he did not like the stress of executing the strategy and Sherline had told him that he believed it was only a matter of when, not if, the strategy would fail.

{¶76} Seidl also offered alternative investment strategies that provided less of a return, but less stress, because he believed that Hughes's "strategy was no better than any other out there, that over time the returns were going to regress to the mean." He claimed he told LaWarre and Papa that Hughes's strategy "may be high flying now but when the volatility returns to the market you're going to be looking at returns that are similar to that of the S & P 500." He also claimed to have told them

24

that it was only a matter of time before it would fail, but he did not explain to either the extreme loss of principal that was likely to result.

{¶77} LaWarre claimed that Seidl had been careful not to undermine the value of Hughes's strategy, but that Seidl did offer other investment options. These other investment options, however, were insufficient to provide LaWarre with the $125,000 to $150,000 monthly income that both Fifth Third Bank and Fifth Third Securities knew LaWarre needed to pay down the lines of credit and loans.

{¶78} After this communication from Seidl in September 2007, Fifth Third Securities and Fifth Third Bank did not give or offer to give investment advice to LaWarre or Papa.

{¶79} Although LaWarre and Papa did not incur a net loss in their options trading accounts over the period that they had invested with Hughes at Fifth Third Securities, they both eventually incurred significant net losses in their Fidelity options trading accounts when the market turned volatile.

{¶80} Papa's first large loss after transferring his investment accounts from Fifth Third Securities occurred in January 2008, about four months later, when he lost over 50 percent of the value in one of his option accounts. The account value dropped from $1.2 million to $440,000. This loss was far more than the five percent loss of principal that Papa had authorized Hughes to expose him to.

{¶81} Papa did not discover the loss, however, until late 2008, when he first read his January 2008 statement. Papa claimed that he did not typically read his statements because he had been repeatedly told by both Hughes and Sturgeon that his loss of principal was capped at five percent. When Papa questioned Hughes about the loss, Hughes told him that he was reading his statement incorrectly and that over $2 million remained in his account.

25

{¶82} In January 2009, Papa asked Hughes to transfer money to pay off his $1.3 million mortgage. Hughes told him that his account had dwindled to $180,000. At that point, Papa closed his accounts with Hughes.

{¶83} LaWarre's first large loss after transferring his investment account from Fifth Third Securities also occurred in January 2008. Collins, who was monitoring the on-going market value of LaWarre's Fidelity options account for Fifth Third Bank, discussed the loss of over $5 million with LaWarre because the value of the account impacted LaWarre's ability to repay on his obligations to Fifth Third Bank.

{¶84} LaWarre told her that he had spoken to Hughes about the loss and that Hughes had reassured him that the options strategy would still work and that he would confine LaWarre's loss to a lower amount. According to LaWarre, the amount of loss was confined to $500,000 per month, and he told Collins this. Collins's notes indicate that she had relayed this information to the credit review division of the bank. LaWarre again felt that he could not back out of the strategy at that point because he needed the income flow to pay back his Fifth Third Bank obligations.

{¶85} At least by April 2008, LaWarre arranged for Collins to receive his Fidelity statements directly from Hughes. LaWarre claimed that Collins had agreed to "review" his account statements and "confirm the account balances" to him over the telephone because he was out of town and not receiving the statements himself.

{¶86} In May 2008, LaWarre began to suffer more losses, and Hughes concealed them on LaWarre's Fidelity account statements. Hughes's modification of some of the figures left internal inconsistencies within the account statement. For example, in the May 2008 statement, Hughes listed the core account holdings as $3,052,508 on page three, but as $4,198,446 on page four. Collins received

LaWarre's modified May 2008 statement from Hughes in early July 2008, and she continued to receive LaWarre's statements from Hughes until October 2008. After which time, she received LaWarre's investment statements from Metro Cities Mortgage.

{¶87} Collins claimed that she never noticed the fraud on the statements and that she merely checked the ending "net-market value account balance" on the first page of the statements. Although she conceded that she had conversations with LaWarre in which she discussed the balances on the monthly statements, she never acknowledged an express agreement with LaWarre to review the statements or to report the ending balance.

{¶88} During this time, LaWarre was communicating regularly with Hughes, who continued to falsify the account statements. Eventually, in March 2009, Hughes confessed to LaWarre that his account had almost no assets.

{¶89} LaWarre and Papa both presented evidence that they would not have continued to allow Hughes to employ his options strategy after he left Fifth Third had they known the true risks involved.

## II. Expert-Witness Opinion

{¶90} In opposition to the motion for summary judgment, LaWarre and Papa presented evidence from several expert witnesses. Steve Stern opined that Collins's review of LaWarre's Fidelity statements was "negligent, insufficient, not reasonably diligent and did not meet industry standards" to monitor a borrower's liquidity or to report on the account's portfolio balance. He arrived at this conclusion because she reviewed only the front page and did not reconcile the summary total on the front page with the supporting page subtotals.

{¶91} According to Stern, had Collins performed a reasonably diligent review, she would have immediately discovered the fraud and, under industry standards, she would have been required to report it to the relevant business and government authorities.

{¶92} Stern also opined that Collins's and Sturgeon's receipt of "incentive compensation" for referring LaWarre and Papa to Hughes violated an FDIC regulation, was unethical, and created a conflict of interest that should have been disclosed to LaWarre and Papa.

{¶93} Sean P. Kelly performed a "cash flow analysis" of LaWarre's Fidelity investment account and opined that the account suffered a net loss of $6,463,900.90 from its inception in September 2007 through March 2009. He also composed a profit and loss summary for each individual security, including options, but he did not provide a cumulative net profit/loss figure for the option trades. Kelly did not factor in any gains from options trading at Fifth Third, compare the figures with general market conditions, or separate out the profit-loss analysis for the different investments in the account, which included options, bonds and security trading.

{¶94} Kelly performed the same analysis for all of Papa's Fidelity accounts. According to his report, Papa's combined accounts suffered a net loss of $2,114,869.90[1] from October 2007 through December 2008.

{¶95} LaWarre and Papa also presented the expert opinion of Gerald Kuschuk, who concluded, after considering all the circumstances of the options trading, including that Papa had invested home equity in options trading and LaWarre had used the options strategy to generate income to pay a mortgage loan,

---

[1] In Papa's pretrial statement, he requested compensatory damages of $1,700,000. It is not clear how he derived this figure.

that the options strategy Hughes used in LaWarre's and Papa's accounts while he was employed by Fifth Third Securities and after was "unsuitable." Kuschuk's report provides in part as follows:

> I have reviewed the Fifth Third Securities and Fidelity Investment account statements of the Plaintiffs. All of these accounts essentially used the same options strategy, first at Fifth Third and later at Fidelity. At both brokerage firms, the clients established short term options spreads on either the S & P or the Nasdaq Index with average durations of a month or less. They were usually done where the short option (put or call or sometimes both) was approximately 5% "out of the money." That means that the underlying index would have to move 5% before the short option would have intrinsic value and become "in the money." In order to reduce the margin requirements of these short options, an equal number of options were typically purchased on the same index with the same expiration month and with an exercise price usually 25 points away from the short option. The result is what is known as a spread position with a 25 point differential.
>
> * * *
>
> Sometimes both put and call spreads were established where a profit would be earned as long as the index

traded within a fixed range during the life of the options.

{¶96} Kuschuk provided examples from several actual transactions to demonstrate that on a monthly basis Hughes had employed option spread transactions with high-risk-to-reward ratios and high leverage in the plaintiffs' accounts with Fifth Third and Fidelity.

{¶97} To that end, on March 21, 2006, a day when the S & P fluctuated between 1296 and 1310, the following transaction took place in Papa's Eagle Flight Fifth Third Securities account: bought "100 puts S & P 500 April 1220 at 1.58 each for $15,800 total"; sold "100 puts S & P 500 April 1245 at 2.47 each for $24,685 total;" resulting in "a net credit of $8,885" ($24,685-$15,800).

{¶98} This transaction resulted in a "credit" of .89 points (2.47-158), while the "spread differential" was 25 points. The "profit potential" was less than one point while the risk potential was over 24 points. Therefore, if the S & P at expiration on April 21, 2006, was over 1245, Eagle Flight would make a profit of $8,886 because all of the options would expire "out of the money." But the maximum risk exposure of the trade was the 25-point spread differential less the initial credit—$2500 multiplied by 100, less $8,885, which equals $241,115—for a risk-to-reward ratio of 27 to 1.

{¶99} The maximum loss of $241,115 would have been incurred if the S & P had dropped below 1220, or 6.5 percent from where it was when the position was initiated. Because Eagle Flight's account equity at the time was $356,000, a 6.5 percent drop in the S & P would have resulted in a 67 percent loss of equity.

{¶100} Kuschuk found that the "pattern of selling out of the money put and/or call spreads for relatively small credits versus the potential risk prevailed throughout Plaintiffs' accounts with Fifth Third and Fidelity." He concluded that

> [w]hile this strategy tends to result in relatively small gains during periods of low to moderate volatility, the potential risks are enormous should the market become more volatile. With risk reward ratios of 10 to over 25 to 1, the high leverage employed, and the relatively large positions taken, an investor could potentially lose all prior gains plus a significant portion of his investment principal, if the underlying index became volatile and moved against only one or two option spread positions.

{¶101} He opined that the

> options strategy employed in the Plaintiffs' accounts at Fifth Third and Fidelity amounted to nothing more than highly leveraged, extreme speculation that was not suitable for any investor due to the relatively large positions, disproportionate risk/reward ratios, large proportion of investment principal at risk, and extreme leveraging employed. If options spread transactions are to be employed, the size of the positions should be modest compared to the size of the accounts due to the large potential risk. It is my understanding that some of the accounts invested

31

home equity in the above described option strategy or used the strategy to generate income to pay a mortgage loan. That only exacerbated the unsuitability of the options strategy employed in those accounts. It would be entirely flawed to believe that the option strategy employed * * * could result in a reliable source of income.

{¶102} Kuschuk also opined that four documents describing the options strategy that Hughes had created for clients while employed by Fifth Third were "misleading in many ways."

### III. Claims Against Fifth Third Securities

{¶103} Unlike the majority, I would address separately the claims against Fifth Third Bank and Fifth Third Securities. I begin with the claims against Fifth Third Securities. The plaintiffs filed an amended complaint alleging that Fifth Third Securities: (1) is liable for the breach of various fiduciary duties; (2) is liable under a contract theory for recommending an "unsuitable investment;" (3) is liable for negligent misrepresentation for representing Hughes's options strategy as a "low-risk suitable strategy"; (4) is liable for the negligent supervision of its employees, including Hughes, Collins, and Sturgeon; (5) is liable for violations of the Kentucky Securities Act; and (6) is liable for fraud for the misrepresentation and concealment of facts. Additionally, LaWarre presented separate claims alleging that Fifth Third Securities (1) is liable to him for violations of the Ohio Securities Act and (2) is liable to him for Collins's conduct in reporting his monthly portfolio balances under the theories of breach of fiduciary duty, breach of contract, negligence, and promissory estoppel.

### IV. Breach-of-Fiduciary-Duty Claims - Based on Conduct of Fifth Third Securities and Its Employees While Hughes was Employed by Fifth Third.

{¶104} In Ohio, a claim of breach of a fiduciary duty is essentially a claim of negligence that involves a higher standard of care. *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988). Thus, to recover on this claim, a plaintiff must prove a breach of a fiduciary duty owed and an injury proximately caused by that breach. *Id.*

{¶105} In moving for summary judgment on this claim, Fifth Third Securities first focused on the timing of LaWarre's and Papa's losses that they claim as damages. It argued that at the time of the losses, it had no duty to control the harmful conduct of its former employee, Hughes, and it owed no fiduciary duty to LaWarre and Papa, who were no longer receiving investment advice from Fifth Third Securities.

{¶106} LaWarre and Papa countered in part that this breach of fiduciary duty claim was based on the breach of the duties that Fifth Third Securities owed to LaWarre and Papa while they invested with Fifth Third Securities and its agent at that time, Hughes.

{¶107} The Third District Court of Appeals has explained the scope of fiduciary duties owed by a broker to a client in providing financial advice:

> In general, the duties of a broker associated with a non-discretionary account * * * include: the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price, and financial prognosis; the duty to inform the customer of the risks involved in purchasing or selling a particular security; the duty not to misrepresent any fact material to the

transaction; and the duty to transact business only after receiving prior authorization from the customer. *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (E.D.Mich.1978), 461 F. Supp. 951, 953, aff'd (6th Cir.1981), 647 F.2d 165. **On the other hand, brokers who handle discretionary accounts become a fiduciary in the broad sense and have increased duties to keep customers informed regarding the changes in the market which affect the customer's interest and to explain the practical impact and potential risks of the course of dealing in which the broker is engaged.** *Id.* (Emphasis added.)

*Burns v. Prudential Sec., Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621 (3rd Dist.).

{¶108} On the evidenced submitted in opposition to the motion for summary judgment, I agree with the majority that the plaintiffs presented sufficient evidence that Fifth Third Securities owed LaWarre and Papa a fiduciary duty while Hughes was in its employ. Not only did Fifth Third Securities provide investment advice to LaWarre and Papa, but the evidence suggests that Hughes exercised discretionary control over their accounts. Thus, there was evidence that Hughes, and, therefore, his employer, became fiduciaries with heightened duties.

{¶109} Further, there is evidence that Fifth Third Securities and its agent Hughes breached these fiduciary duties, including the duty to recommend only suitable investments and the duty to disclose information that is adverse to the

interest of its principal. For example, Kuschuk opined that the options strategy Hughes used while employed by Fifth Third Securities was unsuitable for anyone, including LaWarre and Papa, because of the size of the positions, the large risk involved for small gains, the amount of principal at risk, and the extreme leveraging employed. And there was evidence that Hughes's supervisors did not initially know enough about the strategy themselves to condone the use of it.

{¶110} Further, LaWarre and Papa presented evidence that Fifth Third Securities did not sufficiently disclose to their clients the true risks involved in the options strategy employed by Hughes. Thus, a genuine issue of material fact remains as to whether Fifth Third Securities breached the fiduciary duties owed to LaWarre and Papa.

{¶111} The critical issue in this case is whether a broker-dealer such as Fifth Third Securities may be held responsible for investment losses that are caused by its own misconduct, but that are not realized until after the client transfers his brokerage account to another institution. This raises the issue of proximate cause.

{¶112} This court's prior decision in *Herbert v. Banc One Brokerage Corp.,* 93 Ohio App.3d 271, 638 N.E.2d 161 (1st Dist.1994), did not reach the issue of proximate cause. In *Herbert,* this court held that a bank and a securities brokerage did not have a fiduciary duty to customers to warn them that their former employee was selling them worthless securities after the broker had left the brokerage's employ. *Id.* at 278. When the former employee sold the worthless securities, and thus breached his fiduciary duty to his customers, he was no longer an agent of the bank and brokerage, and the bank and brokerage were no longer providing investment advice to the customers.

{¶113} The *Herbert* court did not address whether the bank and brokerage had breached a fiduciary duty to the customers while the former employee was still employed by the bank and brokerage, as those claims were barred by the statute of limitations. *See id.* at 273-274. Thus, *Herbert* did not involve what a plaintiff must demonstrate to establish that a bank's and a brokerage's breach of fiduciary duties proximately caused losses that occurred after the employee left the employ. Therefore, I believe the majority's reliance on *Herbert* in resolving the issue of causation is erroneous.

{¶114} The concept of proximate cause limits an actor's liability for the consequences of his conduct. "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the end result and of such a significance that the law is justified in imposing liability." Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton on the Law of Torts* Section 41, 264 (5th Ed.1984), cited in *Black's Law Dictionary*, at 234 (8th Ed.2004).

{¶115} Fifth Third Securities also claimed that LaWarre's and Papa's losses were caused by their own conduct, Hughes's misconduct, and the shift in volatility in the market in general.

{¶116} But Kuschuk opined that the strategy Hughes employed when LaWarre and Papa suffered their net losses in their Fidelity accounts was the same strategy that Hughes had used while employed at Fifth Third. And Papa and LaWarre both testified that they stayed with the strategy because Fifth Third employees had so strongly endorsed it and because they were dependent on the strategy to continue to produce the necessary income flow to pay back their Fifth Third loans, which the Investment Advisory Group employees had recommended.

{¶117} Assuming that the existence of intervening and superseding causes of injury can be a defense to actions brought for the breach of a fiduciary duty, the Ohio Supreme Court has acknowledged that the issue of intervening causation generally presents factual issues to be decided by the trier of fact. *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993). The issue is whether the intervening act was "foreseeable" and, therefore, a consequence of the original negligent act, or whether the intervening act is both "new and independent," and, thus, a superseding cause, which operates to absolve the original actor. *Id.*, citing *Cascone v. Herb Kay Co.*, 6 Ohio St.3d 155, 160, 451 N.E.2d 815 (1983). An intervening negligent act is "new" where it could not have been reasonably foreseen and "independent" where there is no connection or relationship of cause and effect between the original and subsequent acts of negligence. *R.H. Macy & Co., Inc. v. Otis Elevator Co.*, 51 Ohio St.3d 108, 111, 554 N.E.2d 1313 (1990), quoting 1 *Ohio Jury Instructions*, Section 11.30 (1983), now OJI CV 405.05.

{¶118} Fifth Third Securities's fiduciary duties ended in September 2007, after LaWarre and Papa transferred their investment accounts to Fidelity and no longer sought or received investment advice from Fifth Third Securities. But the facts present a genuine issue of material fact on the issue of whether the alleged breach of fiduciary duties by Fifth Third Securities before that time, if proved, is so closely connected to LaWarre's and Papa's continued trust in Hughes and reliance on the options strategy as used by Hughes, such that a reasonable person could find that those breaches proximately caused the financial losses ultimately incurred, notwithstanding any intervening causes, including LaWarre's and Papa's own conduct and Hughes's misconduct.

{¶119}   Thus, the trial court erroneously granted summary judgment to Fifth Third Securities on LaWarre's and Papa's breach-of-fiduciary-duty claims based on alleged breaches that occurred when LaWarre and Papa were receiving investment advice from Fifth Third Securities.

### V. *Breach-of-the-Account-Agreement Claim*

{¶120} The Options Account Agreement that LaWarre and Papa signed provides in part that "Your Broker/Dealer is responsible for * * * (4) determining the suitability of investment recommendations and advice, (5) operating and supervising your brokerage account and its own activities in compliance with applicable laws and regulations * * *."   The agreement, which is governed by Massachusetts law, thus incorporates various laws and regulations by the governing organizations, including the Financial Industry Regulatory Authority ("FINRA").[2]  These laws and regulations required Fifth Third Securities (1) to diligently supervise all accounts and registered representatives, (2) to deal fairly with all customers, and (3) to recommend only suitable investments, among other duties.

{¶121} Fifth Third Securities maintains that summary judgment was appropriate on the breach-of-the-account-agreement claim because of *Herbert's* no duty rule and because LaWarre and Papa failed to establish a causal connection between their investment losses in 2008-2009 and Fifth Third Securities's pre-September 2007 conduct.  According to Fifth Third Securities, the causal connection was broken when LaWarre and Papa (1) voluntarily transferred their investment accounts; (2) executed new options trading agreements and written disclosure forms

---

[2]  The options account agreement also contained an arbitration clause for the resolution of disputes.  LaWarre's and Papa's claims against Fifth Third Securities were originally presented for arbitration.  After Fifth Third Securities waived its right to arbitrate, the plaintiffs added Fifth Third Securities as a defendant in this case.

with a new firm and new compliance regime; and (3) made investment decisions with Hughes and his new investment firm, without consulting Fifth Third Securities. But it should not prevail on these arguments.

{¶122} As a preliminary matter, *Herbert* involves tort duties under Ohio law and does not govern a breach-of-contract claim governed by Massachusetts law. Under Massachusetts law, damages recoverable for a breach of contract are limited to those that (1) are the "natural and proximate result" of the breach and (2) are "such as reasonably might have been expected to be within the contemplation of the parties when the contract was entered into as the probable result of a breach of it." *Wheelock v. Postal Tel. Cable Co.*, 197 Mass. 122, 126, 83 N.E. 313 (1908). Fifth Third Securities moved for summary judgment only on the first issue, proximate cause.

{¶123} Here LaWarre and Papa presented evidence that Fifth Third Securities had breached the options contract by designing and implementing an unsuitable investment strategy that involved not just highly-risky, highly-leveraged, and large-position options trading, but the use of liquidated home equity, in Papa's case, and the promise of sufficient income from the options trading to pay a mortgage loan, in LaWarre's case. Thus, the strategy encompassed more than just the monthly options trades.

{¶124} The alleged breaches by Fifth Third Securities also include the failure to supervise its employees and adequately disclose risks to its clients. And LaWarre and Papa presented evidence that because of these breaches, they were compelled to continue with the strategy even after they transferred their accounts from Fifth Third Securities, and they subsequently suffered great financial loss. Therefore, the record contains sufficient evidence of proximate cause to demonstrate the existence of a

genuine issue of material fact and defeat Fifth Third Securities's motion for summary judgment on this claim.

### *VI. Fraud and Negligent-Misrepresentation Claims*

**{¶125}** An action for fraud requires proof of a false material representation, or a similar concealment where there is a duty to disclose; an intent of misleading another into relying upon the representation or omission; and damages proximately caused by the reliance. *See Burr v. Bd. of Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986), paragraph two of the syllabus, *limited on other grounds* by the Political Subdivision Tort Liability Act.

**{¶126}** LaWarre's and Papa's negligent-misrepresentation claim was based on 3 Restatement of the Law 2d, Torts, Section 522 (1965), which the Ohio Supreme Court adopted in a claim against an accounting firm. *Haddon View Invest. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 214, 436 N.E.2d 212 (1982). That section provides the following:

> One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

3 Restatement of the Law 2d, Torts, Section 522 (1965).

{¶127} Important to both of these claims is that a party to a business transaction in a fiduciary relationship with another is required to make full disclosure of material facts known to him but not the other, and to dispel misleading impressions that are or might have been created by partial revelation of the facts. *See Blon v. Bank One*, 35 Ohio St.3d 98, 101, 519 N.E.2d 363 (1988).

{¶128} Fifth Third Securities moved for summary judgment on the ground that LaWarre and Papa could not demonstrate a misrepresentation, because (1) the options contract set forth a sufficient warning concerning the risks, (2) it did not fire Hughes, and (3) it never determined that the options strategy was unsuitable, as demonstrated by its continued allowance of options trading by its employees even after Hughes left.

{¶129} But the evidence presented in opposition demonstrated that Fifth Third Securities employees had represented to LaWarre and Papa that the options strategy, as implemented for them, was a "low-risk investment," that Fifth Third Securities knew before Hughes left and took LaWarre's and Papa's investments with him that the investment strategy was the "equivalent of picking up pennies in front of a steam roller," and that Fifth Third Securities did not disclose to their fiduciaries the unsuitability of the investments or the heightened supervision of Hughes and the facts of his termination. This evidence presented a genuine issue of material of fact on the misrepresentation elements of the fraud and negligent-misrepresentation claims.

{¶130} Fifth Third Securities also moved for summary judgment on these claims on the ground that the plaintiffs failed to present an issue of fact as to the element of justifiable reliance. First, it argued that LaWarre's and Papa's admitted failure to read the disclosure documents provided by Fifth Third Securities destroys

the justifiable reliance element. The plaintiffs signed a document with the following general disclosure that did not reference the particular strategy actually employed:

> [T]he purchase and writing of options contracts involve a high degree of risk, and are not suitable for many investors and, accordingly, should be entered into only by investors who understand the nature and extent of their rights and obligations and are fully aware of the inherent risk involved, especially during extreme market volatility or trading volumes.* * * [I] should not purchase any option unless I am able to sustain a total loss of the **premium** and transaction costs * * *.
> (Emphasis added.)

{¶131} Generally, willful ignorance cannot be equated with reasonable reliance. As the Ohio Supreme Court has stated, "A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking at what he signed." *McAdams v. McAdams*, 80 Ohio St. 232, 240-241, 88 N.E. 542 (1909). But here, as in *McAdams*, there is an allegation of a special relationship of trust and confidence, which is supported by facts in the record, which alters the general rule of willful ignorance.

{¶132} In *McAdams*, the plaintiff-father sought to reform a deed in which he had granted land to his son, an attorney who advised him in making the deed. *Id.* at 236. The burden rested on the plaintiff-father to show by clear-and-convincing proof that the deed was fraudulent, but only after the son at trial had rebutted the

"presumption" of undue influence that arose from the existence of a fiduciary relationship. *Id.* at paragraphs one and two of the syllabus.

{¶133} Further, as LaWarre and Papa have emphasized, the general disclaimer did not warn of massive loss of **principal**. *See generally In re Prudential Securities Inc. Ltd. Partnerships Litigation*, 930 F.Supp. 68 (S.D.N.Y.1996) (holding that genuine issue of material fact remained as to whether the defendant's "carefully masked general warnings" were inadequate "in the face of specific known risks which border on certainties.") Thus, under these circumstances, LaWarre's and Papa's failure to read the options agreement is not the "death knell" of their claim of justifiable reliance.

{¶134} LaWarre and Papa both stated in their deposition testimony that they had relied on Fifth Third Securities's representation that Hughes's options strategy as implemented for them was "low risk" and suitable, and the continued condoning of the strategy and Hughes by Fifth Third Securities's employees, in remaining with the strategy and Hughes. The evidence also demonstrates that neither LaWarre nor Papa understood the strategy.

{¶135} Further, because of the fiduciary relationship between the parties during the representations, and because Fifth Third Securities failed to unequivocally correct the misrepresentations, the facts, when construed in the light most favorable to LaWarre and Papa, support a finding that this continued reliance was justifiable.

{¶136} Similarly meritless is Fifth Third Securities's argument that LaWarre and Papa could not establish justifiable reliance as a matter of law because they had relied on representations from Hughes, and not Fifth Third Securities, when they chose to invest with Hughes from September 2007 until 2009.

{¶137} LaWarre and Papa both presented evidence that they relied on Fifth Third Securities's prior representations in making the decision to continue investing in the strategy that Hughes had implemented for them while he had been employed by Fifth Third. And Papa presented evidence that Sturgeon had encouraged him to transfer his Fifth Third Securities accounts and remain investing with Hughes. Because of this evidence, the issue presented by the fact of Hughes's subsequent advice is one of causation, not justifiable reliance.

{¶138} And, as already discussed, the record contains sufficient facts on proximate causation to defeat the motion for summary judgment on the tort claims. *Herbert* does not address the liability of a financial institution under these circumstances, where the loss does not occur until after the fiduciary relationship has terminated, but the loss is allegedly caused by the earlier breach of those fiduciary and common law duties. Therefore, the trial court's grant of summary judgment to Fifth Third Securities on the fraud and negligent-misrepresentation claims should be reversed.

### *VII. Negligent-Supervision Claim*

{¶139} Fifth Third Securities argued for summary judgment on LaWarre's and Papa's negligent-supervision claim based on *Herbert.* But because LaWarre and Papa presented some evidence of Fifth Third Securities's failure to properly supervise its employees, who breached their fiduciary duties to LaWarre and Papa, and that this failure proximately caused their losses, even after the fiduciary relationship ended, *Herbert* does not apply.

### VIII. Economic-Loss Rule

{¶140} Fifth Third Securities argued that the economic-loss rule barred the plaintiffs' breach of fiduciary duty, negligent-misrepresentation, and negligent-supervision claims because the dispute was the subject of an existing contract between the parties.

{¶141} A party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law. *See Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 117 (6th Cir.1976) (citing *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 [1922]). *See also Motorist Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 590 N.E.2d 1228 (1992) (recognizing that a bad faith claim against an insurer arises separately from a claim based on the breach of the insurance contract, as the duty of good faith towards its insured is implied by law, even though the tort of bad faith arises as a consequence of a breach of a duty established by a particular contractual relationship), *overruled in part on other grounds, Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994), paragraph one of the syllabus.

{¶142} Admittedly, there is overlap in the contractual and tort-based claims because the contracts incorporate the regulatory rules of the relevant governing authorities and the fiduciary duties alleged by LaWarre and Papa are defined in part by those regulatory rules. But to the extent that the tort claims are founded upon an independent legal duty arising out of the relationship of the parties, rather than contractual duties, they are not barred by the economic-loss rule.

### IX. Statutory-Violation Claims

{¶143} Both LaWarre and Papa alleged that Fifth Third Securities violated the Kentucky Securities Act in its sale of securities from its branch office in

Burlington, Kentucky. LaWarre alleged also that Fifth Third Securities's provision of investment advice and sale of securities in Ohio violated Ohio's Securities Act. Fifth Third Securities moved for summary judgment on these claims without addressing the substance of the statutory claims, instead arguing, in general terms, that summary judgment was warranted under *Herbert,* and that the plaintiffs had failed to establish causation as a matter of law because the losses had occurred after the plaintiffs' fiduciary relationship with Fifth Third Securities had ended.

{¶144} But Fifth Third Securities's arguments are not supported by the law. The court in *Herbert* did not discuss liability under Ohio's or Kentucky's Securities Acts. And Fifth Third Securities failed to identify a provision in either act that precludes an award of damages for losses incurred after the termination of the fiduciary relationship. Thus, the trial court erred by granting summary judgment to Fifth Third Securities on those grounds.

### X. Claims Based on Collins's Failure to Accurately Report Balances

{¶145} The final claims against Fifth Third Securities are based on Collins's receipt and review of LaWarre's monthly Fidelity investment statements in 2008 and 2009. LaWarre alleged that Fifth Third Securities was liable to him for the breach of an oral contract, or alternatively, under a theory of negligence or promissory estoppel. Fifth Third Securities moved for summary judgment on these claims on the ground that there was no evidence in the record that LaWarre spoke with anyone at Fifth Third Securities regarding a review of account statements or a reporting of monthly balances. But LaWarre presented evidence that Collins was dually employed by the bank and the securities firm. Therefore, Fifth Third Securities was not entitled to summary judgment on this ground.

{¶146} Next, Fifth Third Securities argued that summary judgment was warranted because there was no evidence that LaWarre sustained any damages caused by any alleged breach of a duty or promise by Fifth Third Securities. But LaWarre presented evidence that he would have stopped investing with Hughes before suffering massive losses in January 2009 if he had been aware that Hughes was fraudulently concealing his monthly losses, which were greater than $500,000.

{¶147} Finally, Fifth Third Securities argued that summary judgment was appropriate on the negligence-in-reporting claim based on the economic-loss doctrine. I agree with the majority that summary judgment was proper on that ground. Fifth Third Securities did not owe a fiduciary duty to LaWarre at that point in time, and LaWarre did not pursue the claim as a negligent-misrepresentation claim. Thus, under these circumstances, any duty that Fifth Third Securities owed to LaWarre to exercise reasonable care in reporting the account balances arose only by contract.

## XI. Claims Against Fifth Third Bank

{¶148} The plaintiffs filed an amended complaint alleging that defendant Fifth Third Bank: (1) is liable for the breach of various fiduciary duties; (2) is liable under common law negligence theory for recommending an "unsuitable investment;" (3) is liable for negligent misrepresentation for representing the Options Strategy as a "low-risk suitable strategy"; (4) is liable for the negligent supervision of its employees, including Hughes, Collins, and Sturgeon; (5) is liable for violations of the Kentucky Securities Act; and (6) is liable for fraud for the misrepresentation and concealment of facts. Additionally, LaWarre presented separate claims alleging that Fifth Third Bank (1) is liable to him for violations of the Ohio Securities Act and (2) is liable to him for Collins's conduct in reporting his monthly portfolio balances

47

under the theories of breach of fiduciary duty, breach of contract, negligence, and promissory estoppel.

### XII. The Bank's Motion for Summary Judgment

{¶149} Fifth Third Bank moved for summary judgment on all of the plaintiffs' claims. With respect to the breach-of-fiduciary-duty claim, it argued that it owed no fiduciary duty to the plaintiffs because the facts demonstrated a mere "debtor-creditor relationship." Under Ohio law, a mere debtor-creditor relationship does not create a fiduciary relationship, absent special circumstances. *See, e.g.*, *Groob v. KeyBank*, 108 Ohio St.3d 348, 351, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 22.

{¶150} This principle has been codified in R.C. 1109.15(E), formerly R.C. 1109.15(D), which provides that "[u]nless otherwise expressly agreed in writing, the relationship between a bank and its obligor, with respect to any extension of credit, is that of a creditor and debtor, and creates no fiduciary or other relationship between the parties."

{¶151} In response, LaWarre and Papa argued that the bank was liable for the breach of fiduciary duties normally imposed on a broker-dealer because of the specific facts in this case. For example, there was evidence that Fifth Third Bank and Fifth Third Securities held themselves out to the public as a single entity called Fifth Third Investment Advisors; that private bankers Sturgeon and Collins referred the plaintiffs to Hughes and received or at least were eligible to receive incentive compensation because of the referral; Sturgeon, Collins, and Hughes had dual employment agreements and were supervised by the same supervisor; the refinancing of Papa's home loan with Fifth Third Bank and the investment of his home equity were part of the investment strategy of the Fifth Third Investment Advisors; the use of options trading to fund LaWarre's payback of a loan with Fifth

Third Bank was part of the investment strategy of the Fifth Third Investment Advisors; and the plaintiffs testified that they were unaware that there were two separate Fifth Third entities.

{¶152} Neither the trial court nor the majority have reached the merits of this argument, instead holding that *Herbert* controls the resolution of the claims because no losses were suffered until LaWarre and Papa voluntarily transferred their investment accounts from Fifth Third Securities. In my opinion, however, the *Herbert* court did not address whether a bank and brokerage could be liable for losses caused by the breach of fiduciary duties, but not occurring until after the termination of the fiduciary relationship, and therefore, the case does not determine the claims in favor of the bank. Thus, the liability of Fifth Third Bank must be addressed.

{¶153} To that end, I agree with the plaintiffs that, on this record, which demonstrates that the Investment Advisory Group employees were agents for both the bank and the broker-dealer, Fifth Third Bank could be liable for the alleged breach of fiduciary duties. The blurring of the lines between the broker-dealer and the bank was such that Fifth Third Bank could be treated as a broker-dealer. *See Scott v. Dime Sav. Bank of New York, FSB*, 886 F.Supp. 1073, 1079 (S.D.N.Y.1995). Thus, Fifth Third Bank was not entitled to summary judgment on the breach of fiduciary duty claim.

### XIII. Fraud and Negligent-Misrepresentation Claims

{¶154} I would also reverse the granting of summary judgment for the bank on the fraud and negligent-misrepresentation claims. The bank, like Fifth Third Securities, argued that LaWarre and Papa could not establish the justifiable-reliance elements of these claims. But as previously discussed, the record contains sufficient

evidence that LaWarre and Papa justifiably relied on the misrepresentations of the Investment Advisor Group employees, who were dually employed by the bank and Fifth Third Securities. Therefore, summary judgment was not appropriate on these claims.

## XIV. Economic Loss

{¶155} Finally, the bank argued that the economic-loss rule barred LaWarre's and Papa's negligence-based claims pertaining to the investment services because they did not have a contract with the bank for investment services. But the record contains evidence that the bank and the securities firm acted as "one in the same," and that the bank owed the plaintiffs a fiduciary duty. Thus, the record contains evidence of privity or a sufficient nexus that could serve as its substitute. Moreover, Ohio courts have allowed the recovery of purely economic losses for professional negligence in the absence of actual privity when the plaintiff is the member of a limited class whose reliance on the representation is specifically foreseen. *See Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 436 N.E.2d 212 (1982), syllabus (holding that "[a]n accountant may be held liable by a third party for professional negligence when that third party is a member of a limited class whose reliance on the accountant's representation is specifically foreseen.")

## XV. Statutory-Violation Claims

{¶156} LaWarre's and Papa's claims based on violations of Ohio's and Kentucky's Securities Acts also survive summary judgment. The Bank generally moved for summary judgment on these claims, arguing that *Herbert* was controlling. But as previously discussed, *Herbert* did not involve claims under these securities acts. And the Bank failed to demonstrate that the securities acts precluded the

recovery of losses occurring after the Fifth Third investment accounts were closed. Accordingly, summary judgment was not appropriate on these claims.

### XVI. Claims Based on Collins's Failure to Accurately Report Balances

{¶157} I would affirm the grant of summary judgment to Fifth Third Bank on LaWarre's negligence claim based on Collins's alleged failure to accurately report account balances to him beginning in May 2008. By September 2007 and onward, neither Fifth Third Bank nor Fifth Third Securities was providing investment advice to LaWarre. Thus, there was no evidence that at that point in time LaWarre had a fiduciary relationship with the bank or any of its employees. Thus, the common law duty that LaWarre based this claim on did not exist as a matter of law, and any alleged duty of reasonable care arose solely by Collins's agreement to review the documents. Therefore, as recognized by the majority, the negligence claim is barred by the economic-loss rule.

{¶158} But I would reverse the grant of summary judgment to Fifth Third Bank on LaWarre's separate claim against Fifth Third Bank for breach of contract, or in the alternative, promissory estoppel, based on Collins's receipt and review of LaWarre's monthly Fidelity brokerage statements beginning in mid-2008 to early 2009.

{¶159} LaWarre presented evidence that Collins, as an agent of Fifth Third Bank, had orally agreed to review his monthly Fidelity statements sent to her by Hughes and to "confirm the account balances" to him by telephone. As LaWarre knew, Collins was monitoring the market value of the Fidelity investment account because the value impacted LaWarre's ability to repay his loan to Fifth Third. Further, it is undisputed that Collins was actually receiving and reviewing the

statements and that she had had conversations with LaWarre concerning the statements.

{¶160} LaWarre additionally produced evidence that the contract was breached and that he suffered damages as a result of the breach. It is undisputed that Collins failed to detect Hughes's fraud. And LaWarre presented an affidavit from a banking expert who opined that Collins's cursory review of the first page of the statement fell below industry standards and that she should have detected Hughes's fraud from her review of the first statement.

{¶161} This, coupled with evidence that LaWarre had undiscovered losses of more than $500,000 in options trades beginning in May 2008, an amount that LaWarre had previously said would result in the termination of his investment relationship with Hughes and his strategy, creates a genuine issue of material fact as to whether Collins's alleged breach contributed to LaWarre's losses.

{¶162} In sum, summary judgment is not appropriate on the breach-of-the-oral contract claims because material issues of fact exist as to whether LaWarre and Collins made such an agreement, the scope of such an agreement, whether Collins breached the agreement, and whether LaWarre suffered damages as a result of the breach.

{¶163} Relatedly, if LaWarre cannot prove the existence of an enforceable contract, he should be able to proceed on his promissory-estoppel claim, which he pled in the alternative. Four elements must be met for a promissory-estoppel claim to succeed: (1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the party seeking to enforce the agreement is injured as a result of his reliance. *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App.3d 250, 260, 661 N.E.2d

796 (1st Dist.1995), citing *Healey v. Republic Powdered Metals, Inc.*, 85 Ohio App.3d 281, 284-285, 619 N.E.2d 1035 (9th Dist.1992); Restatement of the Law 2d, Contracts, Section 90, (1973).

{¶164} LaWarre unequivocally averred that Collins had agreed to "review" the statements and to "confirm the account balances" to him. Further, he presented evidence that Collins knew he was not receiving his Fidelity statements at that time, and that he was relying on her to help him monitor the portfolio value and check on Hughes. Finally, LaWarre presented evidence that Collins should have discovered the fraud and that his reliance on her false information caused him to continue investing with Hughes in the options investment strategy. Accordingly, I would reverse the entry of summary judgment on the promissory-estoppel claim.

### XVII. Conclusion

{¶165} The trial court misapplied the law with respect to the liability of a bank and broker-dealer for the breach of fiduciary or contractual duties that cause economic losses to clients. Thus, I would reverse the trial court's judgment granting summary judgment to Fifth Third Securities and Fifth Third Bank on all claims, with the exception of LaWarre's separate negligence claim that was based on Collins's review of his Fidelity Investment statements.

Please note:
    The court has recorded its own entry this date.